IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-03070-CBS

NORGREN, INC., a Delaware corporation,

        Plaintiff/Counter-defendant,

v.

NINGBO PRANCE LONG, INC., a People's Republic of China corporation,

        Defendant/Counter-plaintiff.

---

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL
ARBITRATION AND STAY COURT PROCEEDINGS**

---

Magistrate Judge Shaffer

       This matter comes before the court on Defendant Ningbo Prance Long, Inc.'s (hereinafter "NPL") Motion to Compel Arbitration and Stay Court Proceedings (doc. #12), filed on December 24, 2014.  Plaintiff Norgren, Inc. filed its Response in Opposition (doc. #17) on January 14, 2015.  This case has been referred to the Magistrate Judge upon the parties' consent pursuant to the District Court's Pilot Program to Implement the Direct Assignment of Civil Cases to Full Time Magistrate Judges and 28 U.S.C. § 636(c).

       On February 19, 2015, the court heard oral argument on the pending motion.  At the conclusion of that hearing, the court invited the parties to file supplemental briefs to address case law cited by the court in its comments from the bench.  Both sides filed supplemental briefs on February 27, 2015.  On August 20, 2015, following the Tenth Circuit's decision in *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287 (10th Cir. 2015), the court held a hearing to allow

1

counsel an opportunity to address whether, or to what extent, that decision impacts the pending

motion.  I have carefully considered the parties' briefs and attached exhibits, reviewed the entire

case file, and conducted my own legal research.  This court has also reviewed the transcript from

the hearing on February 19, 2015 and considered the arguments presented during the August 20th

hearing.  For the reasons set forth below, I will deny Defendant NPL's motion.

## PROCEDURAL BACKGROUND

Plaintiff Norgren initiated this action on November 13, 2014 by filing a Complaint (doc.

#1), seeking "a declaratory judgment that "Norgren properly terminated [it's] Purchase

Agreement [with NPL]," that "NPL defaulted in the First Arbitration," that "NPL has waived its

right to pursue its claims in the [Second] Arbitration," and "[t]here is no valid arbitration

agreement between Norgren and NPL."  Norgren also requests "injunctive relief enjoining the

proceedings in the [Second Arbitration]."  Defendant NPL filed Counterclaims Against Norgren,

Inc. (doc. #10) on December 23, 2014, seeking a declaration that "NPL's and Norgren's

agreement [to arbitrate their disputes] is valid, binding, and enforceable" and an "order from this

Court declaring Norgren is required to arbitrate the claims NPL submitted to the AAA for

arbitration pursuant to the parties' agreement to arbitrate."  In the alternative, NPL is asserting in

this action claims for breach of contract, breach of the duty of good faith and fair dealing,

violation of the Colorado Commercial Code, and unjust enrichment.  On January 13, 2015,

Norgren filed an Answer to Counterclaim (doc. #16) claiming, *inter alia*, that "NPL's damages,

to the extent it has any, are barred by the doctrine of offset" since NPL's alleged failure to

perform under the terms of the Purchase Agreement caused "Norgren losses exceeding $3

million."

From a careful reading of the parties' briefs and attachments, it appears the following material facts are not in dispute.  Norgren (headquartered in Littleton, Colorado) and NPL (headquartered in the People's Republic of China) entered into a Purchase Agreement in December 2006.  *See* Exhibit A (doc. #12-1) attached to NPL's Motion to Compel Arbitration. Under the terms of that agreement, NPL (the "Seller") committed to produce various die-cast molded parts and maintain tooling, fixtures and other equipment owned by Norgren (the "Buyer") and supplied to NPL.  It was understood that the parts produced by NPL ultimately would be incorporated into various Norgren-manufactured products.  In the Purchase Agreement, NPL acknowledged Norgren's continuing ownership of tooling and other enumerated equipment, and agreed to deliver that equipment "in good working condition, reasonable wear and tear excepted, to [Norgren] immediately upon request by [Norgren]."  *Id.* at Attachment B to Purchase Agreement (doc. #12-2, at page 20 of 28).  The Purchase Agreement further stated in Attachment B that "Buyer may, by notice in writing to Seller, terminate the Purchase Agreement or work there under, in whole or in part, at any time and such termination shall not constitute default."

> In such event, Buyer will pay Seller Agreement price for finished goods covered by this agreement held in Seller's inventory provided product is completed to specifications and accepted by Buyer. . . . Buyer shall have the right to cancel for default all or any part of the Purchase Order upon the occurrence of any of the following events: (a) Seller does not make deliveries or furnish services according to the terms specified . . .

*Id.* at 20-21 of 28.

Under the terms of the Purchase Agreement, Norgren and NPL agreed that "[a]ny controversy or claim arising out of or relating to [the] Terms and Conditions [of the Purchase Agreement] or the Purchase Order, or the making, performance or interpretation thereof . . . shall

3

be settled by binding arbitration."  More specifically, the Purchase Agreement stipulated that

arbitration proceedings would take place in Denver, Colorado before one arbitrator in

accordance with the Commercial Arbitration Rules of the American Arbitration Association (the

"AAA Rules"), and that "[j]udgment upon any arbitration award may be entered in any court

having jurisdiction thereof."  *Id.* at Attachment B to Purchase Agreement (doc. #12-2, at page 21

of 28).  It was also agreed that the "Purchase Order shall be interpreted and construed in

accordance with the laws of the State of Colorado."  *Id.* at Attachment B to Purchase Agreement

(doc. #12-2, at page 22 of 28)

    At some point after 2006, the parties' business relationship soured.  According to

Norgren, NPL failed to produce parts that met the quality standards and delivery requirements

set out in the Purchase Agreement.  Norgren also asserted that NPL refused to return its tooling

and other fixtures upon Norgren's demand, as contractually required under the Purchase

Agreement.  For its part, NPL accused Norgren of failing to pay for goods and other benefits

conferred by NPL.  On April 30, 2009, Norgren informed NPL in writing that Norgren's board

of directors had decided to terminate the Purchase Agreement effective immediately.

    On November 18, 2009, pursuant to the Purchase Agreement, NPL initiated arbitration

proceedings (hereinafter the "First Arbitration") by submitting to the AAA and serving on

Norgren a Demand for Arbitration and Statement of Claim.  *See* Exhibit B (doc. #12-3) attached

to NPL's Motion to Compel Arbitration.  That Statement of Claim asserted that NPL was owed

more than $1.5 million based on Norgren's alleged failure to pay amounts due under the

Purchase Agreement.  On December 23, 2009, Norgren filed its Answer and Counterclaim in the

First Arbitration, admitting that "certain NPL invoices [had] not been paid," but also asserting

that

> NPL is attempting to collect for goods that did not meet the quality standards
> required under the terms of the Purchase Agreement; that NPL is attempting to
> collect for goods that were not ordered or were otherwise not required to be
> produced under the terms of the Purchase Agreement; that damages and losses
> sustained by Norgren as a consequence of NPL's many breaches of the Purchase
> Agreement, as set forth in the counterclaim below, far exceed the amount that
> NPL claims.

*See* Exhibit C (doc. #12-4) attached to NPL's Motion to Compel Arbitration.  In its

Counterclaim, Norgren sought in excess of $3 million "for all of the losses and damages that it

has sustained as a consequence of NPL's breaches of the Purchase Agreement and the

conversion of Norgren's property."  Norgren's Answering Statement and Counterclaim was

accompanied by a check in the amount of $8,000 reflecting Norgren's share of the arbitration

filing fee.  *See* Exhibit C (doc. # 17-5), attached to Norgren's Response in Opposition.

On February 2, 2010, the assigned arbitrator, Robert Benson, forwarded to the parties and

the arbitration case manager a draft Pre-Hearing and Scheduling Order.  *See* Exhibits F-1 and F-

2 (doc. #17-8), attached to Norgren's Response in Opposition.  Mr. Benson asked the parties to

review "the draft very carefully, and advise me of any additions, deletions, and revisions you

would like me to consider."  On February 4, 2010, Norgren's counsel forwarded to the

arbitration case manager a check for $1,200 reflecting Norgren's share of the arbitrator's

compensation for 8 hours expended on preliminary matters.  *See* Exhibits G-1, G-2 and G-3

(doc. #17-9), attached to Norgren's Response in Opposition.

Mr. Benson wrote to the parties on February 8, 2010, forwarding a second draft of the

proposed Pre-Hearing and Scheduling Order and again requesting "comments, suggestions,

objections, etc."  Mr. Benson emphasized that the dates incorporated in the draft order "are firm

unless and until I revise them," and for that reason, the arbitrator urged the parties to begin

"assembling and exchanging documents for disclosure" and to "expeditiously proceed to fulfill

all other terms of this Draft Order."  In the same letter, Mr. Benson noted

> I did not receive any specific comments with respect to Draft #1 from [NPL]
> although I was requested to shortening (sic) the time period, etc, as much as
> possible.  Mr. Qu, I am not sure what you had in mind when you state "if some of
> the process can be combined and finished at one time."  Mr. Qu, I might note and
> acknowledge the difficulty you have in being in the People's Republic of China
> while the proceedings take place in the United States.  Do note that I speak only
> English, and hence I have a provision in Draft #2 pertaining to interpreters.  Mr.
> Qu, I want to accommodate your needs by being in another country.  Consistent
> (sic.) with not prejudicing [Norgren].  Hence, within those limitations, please let
> me know how I might accommodate your particular needs.  However do let me
> know very soon.

*See* Exhibits H-1 and H-2 (doc. #17-10), attached to Norgren's Response in Opposition.

Mr. Benson communicated with NPL's representative, Mr. Qu, on February 13, 2010.

The arbitrator assured Mr. Qu that he wanted a arbitration that "is full and fair to both parties,"

and that he was required "to follow and comply with the arbitration provisions in the contract

between the parties, which includes the AAA Commercial Rules.  When Ningbo Prance Long,

Inc. agreed to those provisions in the contract, it created an obligation to comply with the

contract, including the arbitration provisions." *See* Exhibit I-3 (doc. #17-11), attached to

Norgren's Response in Opposition.  On February 23, 2010, Mr. Benson again wrote to Mr. Qu

indicating that he "would most appreciate a response" to his email of February 13, and asking

again for NPL's input on the draft Pre-Hearing and Scheduling Order.  *Id.*

On that same day, Mr. Qu responded by email, stating that NPL agreed to the schedule

outlined in the draft Pre-Hearing and Scheduling Order.  However, NPL "want[ed] to cancel the

process of [Section] IV, as regarding to the hearing, we are not able to be in [USA], do you think

the hearing can be held in some other way, like conference call." *See* Exhibit I-2 (doc. #17-11),

attached to Norgren's Response in Opposition.  Counsel for Norgren responded to NPL's

proposal in a separate email to Mr. Benson and Mr. Qu on February 23, 2010.  Norgren indicated

a willingness to consider other dates for the hearing in Denver, but

> does not waive its right to a hearing in Denver, Colorado as provided in the
> parties' Agreement, and Norgren does object to NPL participating by telephone. .
> . . As reflected in NPL's Demand and Norgren's Counterclaim, substantial sums
> are being sought and the issues are not simple. . . . Norgren believes that it will be
> impossible to conduct a fair and meaningful hearing over the telephone.
> Regarding Section IV of the draft Order, Norgren agrees that the requirements set
> forth therein are important and would help pave the way for an efficient and fair
> hearing.[1]

*See* Exhibit I-1 (doc. #17-11), attached to Norgren's Response in Opposition.

On February 24, 2010, Mr. Benson issued a final Pre-Hearing and Scheduling Order in

which he directed each party to submit their Statement of Issues on or before March 10, 2010, to

be followed by an itemization of their damages.  Arbitrator Benson also required the parties to

provide document disclosures on or before March 25, 2010.  An arbitration hearing was set for

May 18-20, 2010 in Denver, Colorado.  *See* Exhibit L-1 (doc. #17-14), attached to Norgren's

Responge in Opposition.

More importantly, on February 23, 2010, the arbitrator informed the parties that he had

been advised that AAA "has insufficient funds to cover the first eight hours of my service.

---

[1]Mr. Benson had asked Norgren's counsel to comment on Mr. Qu's proposal of February
23 to delete Section IV from the draft Pre-Hearing and Scheduling Order.  In that email, Mr.
Benson expressed his "general inclination" that Section IV 'is important."  *See* Exhibit I-2 (doc.
#17-11), attached to Norgren's Response in Opposition.  Section IV bears the heading
"AMENDMENT TO PLEADINGS; SPECIFICATION OF CLAIMS; STATEMENT OF THE
ISSUES; STATEMENT (ITEMIZATION) OF DAMAGES" and sets certain deadlines for
submitting those statements to the arbitrator.  *See* Exhibit F-2 (doc. #17-8), attached to Norgren's
Response in Opposition.

Accordingly, after issuance of the Pre-Hearing and Scheduling Order, and in conformance with the rules that the parties agreed to in their arbitration agreement, I will suspend all proceedings pending receipt . . . . that the outstanding amount has been paid." Benson also warned that "with the scheduling of the hearing, [the AAA] will also be requesting deposits to cover the entire estimated hearing time."[2] *See* Exhibit I-1 (doc. #17-11), attached to Norgren's Response in Opposition. The shortage of required fees was solely attributable to NPL. *See* Exhibit J-1 (doc. #17-12), attached to Norgren's Response in Opposition. The arbitration case manager informed NPL on February 24, 2010 that it was in arrears in paying an outstanding invoice for Mr. Benson's services and warned that "every effort must be made on your part to remit payment of the due amount to ensure the smooth running of the process. Please remit payment by close of business March 02, 2010." *See* Exhibit K-1 (doc. #17-13), attached to Norgren's Response in Opposition.

On March 9, 2010, Norgren forwarded to the arbitrator its Statement of Issues. *See* Exhibit 0 (doc. #17-17), attached to Norgren's Response in Opposition. Two days later, Norgren's counsel wrote to Mr. Benson "to respectfully request that the current suspension be extended to include the deadlines in the Pre-Hearing and Scheduling Order." *See* Exhibit P-1 (doc. #17-18), attached to Norgren's Response in Opposition. Given that "NPL did not provide a Statement of Issues" as required by the arbitrator, Norgren expressed the fear that its further compliance with the deadlines in the Pre-Hearing and Scheduling Order "will give NPL substantial insights into Norgren's case. It is not, we believe, just or proper that these expenses

---

[2]The February 24, 2010 Pre-Hearing and Scheduling Order contemplated a three-day hearing.

be incurred, and the concomitant insight provided, until the suspension is lifted and it becomes

clear that both parties intend to proceed in accordance with the requirements of the [AAA] and

the Arbitrator." *Id.* On March 15, 2010, the arbitration case manager advised the parties that

"all the deadlines set in the Pre-Hearing and Scheduling Order are hereby suspended until the

full payment of the outstanding balance by either Party. " *See* Exhibit N-1 (doc. #17-16),

attached to Norgren's Response in Opposition.

 Thereafter, the parties, the arbitration case manager, and Mr. Benson exchanged a series

of emails addressing the issue of outstanding fees and the arbitration process itself.  On March

25, 2010, in an email to the arbitration case manager, Norgren's counsel suggested it was

"unlikely that NPL is going to pay either the earlier invoice or the invoice most recently issued."

Fearing that contingency and wanting time to weigh its options, Norgren asked whether it

"could, without terminating the proceedings, defer making some or all of the payments in the

attached invoice for a reasonable period of time while it evaluates the situation. . . . Lastly, if

NPL does not pay, we would appreciate some estimate of payments that would be required of

Norgren beyond the attached invoice in order to lift the stay and proceed to hearing." *See*

Exhibits FF-1 and FF-2 (doc. #17-34), attached to Norgren's Response in Opposition.  The

arbitration case manager responded promptly, explaining that "[Norgren] may pay Claimant's

share of neutral compensation of $7,350.00 to proceed.  If [Norgren] wishes to cover Claimant's

share of arbitrator compensation, the arbitrator will consider the counterclaim and the claims

filed." *Id.*

 After arbitration proceedings had been stayed for three months, NPL communicated with

the arbitration case manager on June 16, 2010, stating that

> [W]e want to use the most simple process to arbitrate our case. [T]he only thing we need you to do is arbitrate Norgren broke the contract and should pay all of the over due payment to us. [W]e don't want to have the hearings. [W]e think eight hours is enough to arbitrate our case. [H]ope you can understand it could be finished as soon as possible.

*See* Exhibit BB-1 (doc. #17-30), attached to Norgren's Response in Opposition.  The arbitration case manager responded the same day, stating that the matter "will remain in abeyance" until NPL deposited sufficient funds with AAA.  The arbitration case manager also observed that the amount of deposited funds is "based on the Arbitrator's estimates, not the estimates of the parties."  *Id.*

On June 20, 2010, NPL again contacted the arbitration case manager to reiterate its view that "our case is very easy to be arbitrated . . . the only thing we need you to do is arbitrate Norgren broke the contract and should pay all of the paid of due to us."  In the same email, NPL's representative asked: "[could we make sure the proceeding of arbitration first [and] then talk about the balance arbitration fee. [W]e want to make sure the process of the arbitration first since we don't want to have the hearings."  *See* Exhibit AA (doc. #17-29), attached to Norgren's Response in Opposition.  The arbitration case manager wrote back on June 22, 2010, stating that "after receiving comments from both sides [Mr. Benson] will determine whether he will be able to make his decision based on document submissions alone and without a hearing."  However, NPL again was advised that "[w]ithout having sufficient deposit to compensate Mr. Benson, the arbitration proceeding cannot move forward."  *See* Exhibit AA (doc. #17-29), attached to Norgren's Response in Opposition.

This dialogue resumed on July 13, 2010 with an email that NPL sent to the arbitration case manager, Mr. Benson, and Norgren's counsel.  In this communication, NPL asked whether

a hearing "must be held or we can choose [to] cancel it . . . we don't want to have the hearing." In NPL's view, the matter could be decided "in a simple way" since Mr. Benson was only required to decide that Norgren breached the Purchase Agreement.  *See* Exhibit CC-4 (doc. #17-31), attached to Norgren's Response in Opposition.

Mr. Benson responded with his own email on July 16, 2010, in which he again pointed out that the parties had agreed to follow the AAA Rules, which meant that he was "obligated to follow the arbitration agreement, the Commercial Arbitration Rules of the American Arbitration Agreement, and applicable law."  Mr. Benson further explained that "either party has the right to have a hearing in which to present evidence in support of their claims and in defense of the other party's claim."  As for NPL's options, the arbitrator noted that

> You can ask the [AAA] and me for leave to withdraw your arbitration claim against Norgren, Inc.  With the consent of Norgren, it is likely that your request would be allowed.  Without the consent of Norgren, you still might be allowed to withdraw your claim.  Perhaps this would depend upon the basis of Norgren's objection.  It is possible that the only termination of your claim other than an award would be a dismissal with prejudice, meaning that you could not assert the claim again. . . . Please also note that if the claims of [NPL] were withdrawn, dismissed, etc., the arbitration would remain as to the claims of Norgren, Inc.  Those claims would proceed or not proceed in accordance with my Order of July 9, 2010.  Further, I note that [NPL] has not complied with my Pre-hearing and Scheduling Order.

*See* Exhibits CC-2 and CC-3 (doc. #17-31), attached to Norgren's Response in Opposition.[3]

On July 21, 2010, NPL again expressed the view that its case against Norgren was clear and incontrovertible.  For that reason, NPL asked Mr. Benson to "arbitrate Norgren breach the contract and compensate for large expense due to the breach of agreement."  *See* Exhibits CC-1

---

[3]As of July 16, 2010, NPL still had not submitted its required statement of issues or an itemization of the damages it sought to recover.

and CC-2 (doc. #17-31), attached to Norgren's Response in Opposition.  The arbitration case manager promptly responded explaining that "[t]he matter is suspended due to lack of payment" and "no further action will take place until the matter is fully funded by either party."  *Id.*

On July 29, 2010, NPL sent another email to the arbitration case manager reiterating its view that "Norgren [has] admitted that they didn't pay us the over due payment."  For that reason, NPL believed the parties:

> [don't] need too much time and too much process. [W]e have paid USD8000 for case service fee. [W]e will pay other fee after we make sure all of the process and what will you do next. [W]e think our case is very clear so we want you to arbitrate the case [directly].

*See* Exhibit EE-2 (doc. #17-33), attached to Norgren's Response in Opposition.  The arbitration case manager responded to this communication by reminding NPL that the matter had been suspended for lack of payment and "no further action will take place until the matter is fully funded **by either party**."  *See* Exhibit EE-1 (doc. #17-33), attached to Norgren's Response in Opposition (emphasis in original).

NPL wrote again to the arbitration case manager, Mr. Benson, and Norgren's counsel on August 11, 2010, restating its position that Norgren had breached the Purchase Agreement and admits that "they didn't pay [NPL] the over due payment."

> Our case is lasted for one year long, we emphasize pls arbitrate the case according the statement as above. [B]ut we never got any specific information from AAA. Now we emphasize again pls inform us why our case can not be arbitrated since it takes so long time.

*See* Exhibits DD-1 and DD-2 (doc. #17-32), attached to Norgren's Response in Opposition.

Against the backdrop of NPL's continued failure to pay its required arbitration fees, Norgren submitted on August 20, 2010, a Memorandum in Support of Motion to Dismiss NPL's

Demand with Prejudice.  *See* Exhibit V (doc. #17-24), attached to Norgren's Response in

Opposition.  In its Memorandum, Norgren argued that NPL must either "do that which is

required: pay its share of the invoiced deposit amounts" or "have its claim dismissed with

prejudice."  In contrast, Norgren suggested that its counterclaim should not be dismissed

summarily.

> [A]t present, uncertainty remains.  While unlikely, NPL may choose to pay its
> share.  If NPL does not pay, and Norgren's motion is granted, Norgren may
> eventually decide to request that its Counterclaim be dismissed without prejudice.
> The costs of going forward on the Counterclaim in arbitration, together with costs
> and uncertainties associated with enforcing the Award in China, require further
> consideration.  Therefore, having fully complied with the Rules and Orders,
> Norgren believes that it is entitled to a reasonable period of time, in the range of
> three months, following the ruling on this motion to decide how to proceed.

*Id.*

On September 13, 2010, Mr. Benson issued an Order of Dismissal Without Prejudice.

*See* Exhibit X (doc. #17-26), attached to Norgren's Response in Opposition.  In his Order, Mr.

Benson noted "the failure of the parties to deposit the estimated administrative expenses and

estimated arbitrator compensation as directed by the [AAA]" and Norgren's pending Motion to

Dismiss.  Citing Rule R-54 of the AAA's Commercial Rules, Mr. Benson noted that if

"arbitrator compensation or administrative charges have not been paid in full," he had the

authority to "order the suspension or termination of the proceedings."  The arbitrator specifically

declined to rule on Norgren's motion and ordered that "the Demand and Counterclaim therein,

be, and hereby are, dismissed without prejudice."  Although Mr. Benson signaled that his Order

"will be withdrawn nunc pro tunc" if the balance of AAA-directed deposits were paid within

seven calendar days, an Order of Confirmation of Dismissal Without Prejudice was entered on

September 30, 2010.  *See* Exhibit Y (doc. #17-27), attached to Norgren's Response in

Opposition.

After September 2010, Norgren and NPL engaged in unsuccessful settlement negotiations.  On October 17, 2014, NPL initiated the Second Arbitration by filing a Demand and Statement of Claim, and paying an administrative filing fee of $12,800.  In its Statement of Claim, NPL asserts claims "aris[ing] out of Norgren's breaches of contract and violations of the Colorado Uniform Commercial Code and other applicable laws, including Norgren's failure and refusal to pay NPL for amounts due for partes which Norgren ordered, received, and accepted and otherwise for which Norgren is responsible under the parties' Purchase Agreement."  *See* Exhibit L (doc. #12-13), attached to NPL's Motion to Compel Arbitration.  That Statement of Claim focuses exclusively on events and conduct that occurred on or before April 30, 2009. Notably, the Statement of Claim makes no reference, even in passing, to the earlier arbitration proceeding.

Norgren filed an Objection to Arbitration on November 13, 2014, in which it challenged "the jurisdiction of the arbitrator and to the arbitrability of NPL's claims."  *See* Exhibit D (doc. #12-18) to the Affidavit of Christina Alabi, attached to NPL's Motion to Compel Arbitration. Norgren argued that:

> Under federal law, NPL defaulted in the First Arbitration and through this default NPL has waived any right to enforce the arbitration clause contained in the parties' December 22, 2006 Purchase Agreement. . . . Moreover, under applicable federal law, the questions of whether NPL has defaulted and whether this conduct waives its right to arbitration are questions for the Court in the first instance.

On the same day, Norgren commenced the instant litigation.  NPL's pending motion followed.

# ANALYSIS

The "liberal federal policy favoring arbitration" is well-recognized. *Moses H. Cone Mem'l. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (2008), *superseded by statute on other grounds by* 9 U.S.C. § 16(b)(1).  Consistent with this underlying policy, the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, directs that upon motion by a party, the court "shall" stay a judicial action pending completion of arbitration proceedings, if the court is satisfied that the issue *sub judice* is referable to arbitration and "the applicant for the stay is not in default in proceeding with such arbitration."  *See* 9 U.S.C. § 3.  Alternatively, § 4 of the FAA  empowers a party "to invoke the authority of a federal district court in order to force a reluctant party to arbitrate a dispute."  *Mut. Benefit Life Ins. Co. v. Zimmerman*, 783 F. Supp. 853, 865 (D.N.J. 1992) (quoting *Painewebber Inc. v. Hartmann*, 921 F.2d 507, 510 (3d Cir. 1990)).  Under that provision, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" may petition the district court "for an order directing that such arbitration proceed in the manner provided for in such agreement."  *See* 9 U.S.C. § 4.

"Before [a] party may be compelled to arbitration under the [FAA], the district court must engage in a limited inquiry to determine whether a valid arbitration agreement exists between the parties and whether the specific dispute falls within the scope of that agreement."  *Let's Go Aero, Inc. v. Cequent Performance Prods., Inc.*, 78 F. Supp. 3d 1363, 1372 (D. Colo. 2015) (quoting *Houlihan v. Offerman & Co. Inc.*, 31 F.3d 692, 694-95 (8th Cir. 1994)).  It is undisputed that the parties' Purchase Agreement, which Norgren purported to terminate in 2009, included an arbitration provision.  Notwithstanding the federal policy in favor of arbitration, this court must decide whether the parties remain bound by that arbitration agreement or, stated

differently, whether the premature dismissal of the First Arbitration effectively precludes NPL's latest attempt to invoke that provision.

An issue or dispute is "arbitrable if it is subject to decision by arbitration or referable to an arbitrator or arbiter." *Burlington N. and Santa Fe Ry. Co. v. Pub. Serv. of Okla.*, 636 F.3d 562, 567-68 (10th Cir. 2010) (holding that "[s]o long as the parties have not specifically agreed to submit the arbitrability question itself to arbitration (i.e., to arbitrate arbitrability), a court will independently decide whether the merits of the parties' dispute is arbitrable").  As the Supreme Court has explained:

> [C]ourts presume that the parties intend courts, not arbitrators, to decide what we have called disputes about "arbitrability."  These include questions such as "whether the parties are bound by a given arbitration clause," or "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy."  On the other hand, courts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration.  These procedural matters include claims of "waiver, delay or a like defense to arbitrability."

*BG Group, PLC v. Republic of Argentina*, 134 S.Ct. 1198, 1206-07 (2014) (internal citations omitted) (citing with favor *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84-86 (2002)). *Cf. Wolford v. Flint Trading, Inc.*, No. 13-cv-02835-WYD-CBS, 2014 WL 3747177, at *2-4 (D. Colo. Jul. 30, 2014) (noting that the question of arbitrability is an issue for judicial determination unless the parties' agreement clearly and unmistakenly provides otherwise).  Accordingly, this court must determine whether the parties remain bound by their arbitration agreement.

Norgren contends that NPL forever waived its arbitration rights under the Purchase Agreement by refusing to pay required fees and defaulting in the First Arbitration.  In support of this argument, Norgren cites with favor the Tenth Circuit's recent decision in *Pre-Paid Legal Servs., Inc. v. Cahill*, 786 F.3d 1287 (10th Cir. 2015), which in turn relies on *Sink v. Aden*

16

*Enters.*, 352 F.3d 1197 (9th Cir. 2003).  The plaintiff in *Pre-Paid Legal Servs.* filed an action

against its former employee, Todd Cahill, alleging tort and contract violations.  Under Cahill's

employment contract, all disputes and claims between the parties were to "be settled totally and

finally by arbitration. . . in accordance with the Commercial Arbitration Rules of the American

Arbitration Association."  After Pre-Paid initiated litigation in state court, Mr. Cahill removed

the case to federal court and then moved, without objection, to stay judicial proceedings pending

arbitration.  However, once Pre-Paid initiated arbitration proceedings and advanced its share of

the required fees, Mr. Cahill repeatedly declined to pay his portion of those fees.[4]  The

arbitration panel suspended the arbitration after warning Mr. Cahill that such action would

follow if he failed to make the required payments by a specified date.  Thereafter, AAA

terminated the arbitration and closed its file.  When the plaintiff moved to lift the stay on judicial

proceedings, Mr. Cahill challenged that ruling.

 The Tenth Circuit held that "[f]ailure to pay arbitration fees constitutes a 'default' under

[FAA] § 3"[5] and that "Mr. Cahill's failure to pay his share of costs precludes him from seeking

---

[4]The Tenth Circuit noted that "[t]he AAA repeatedly asked [Mr. Cahill] to pay" and that "Mr. Cahill did not show he was unable to afford payment, ask the arbitrators to modify his payment schedule, or move for an order requiring Pre-Paid to pay his share for him so that arbitration could continue.  Instead, by refusing multiple requests to pay, he allowed arbitration to terminate."  *Pre-Paid Legal Services*, 786 F.3d at 1294.

[5]*Cf. Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 989 (2d Cir. 1942) (suggesting that the reference to "default" in § 3 applies to "a party who, when requested, has refused to go to arbitration or who has refused to proceed with the hearing before the arbitrators once it has commenced").  *See also N & D Fashions, Inc. v. DHJ Indus., Inc.*, 548 F.2d 722, 728 (8th Cir. 1976) ("A default occurs when a party 'actively participates in a lawsuit *or takes other action inconsistent with' the right to arbitration.*") (emphasis added) (quoting *Cornell & Co. v. Barber & Ross Co.*, 360 F.2d 512, 513 (D.C. Cir. 1966); *Kirkpatrick v. People*, 179 P. 338 (Colo. 1919) (holding that "the term 'default' should be defined as: '[a] failure to appear and contest a point of law or fact by presentation of counter argument or proof'").

arbitration." *Pre-Paid Legal Services*, 786 F.3d at 1294-95 and n. 3.  In reaching this

conclusion, the Tenth Circuit cited with favor "decisions of other courts that have determined

that a party's failure to pay its share of arbitration fees breaches the arbitration agreement and

precludes any subsequent attempt by that party to enforce that agreement." *Id.* at 1295; *see, e.g.,*

*Brown v. Dillard's, Inc.*, 430 F.3d 1004, 1011 (9th Cir. 2005), *Sink*, 352 F.3d at 1201; *Rapaport*

*v. Soffer*, No. 2:10-cv-00935-KJD-RJJ, 2011 WL 1827147, at *2 (D. Nev. May 12, 2011)*; and*

*Garcia v. Mason Contract. Prods., LLC,*, no. 08-23103-CIV, 2010 WL 3259922, at *3 (S.D. Fla.

Aug. 18, 2010).  The Tenth Circuit further held that the question of default under § 3 was not

uniquely reserved for the arbitrator, but could instead be decided by the district court.  *Pre-Paid*

*Legal Servs.*, 786 F.3d at 1298.  Applying the analysis in *Pre-Paid Legal Services* to the facts in

the instant case, I must conclude that NPL defaulted in the First Arbitration by failing to pay its

share of required arbitration fees.

NPL argues that *Sink* and its progeny, including *Pre-Paid Legal Services,* are

distinguishable on their facts.  First, NPL notes that unlike the arbitrators in *Sink*, Mr. Benson

did not enter a formal default order, but rather dismissed the First Arbitration without prejudice.

Mr. Benson's Order does not expressly prelude the possibility of future arbitration proceedings.[6]

The Tenth Circuit, however, rejected the same argument in *Pre-Paid Legal Services,* holding that

"the absence of a formal finding of default by the arbitrators does not preclude the district court

from making that determination under § 3." *Id.* at 1296.

---

[6]The court notes that Mr. Benson's email of July 16, 2010 alluded to the possibility that
NPL's claim could be dismissed with prejudice, "meaning that [NPL] could not assert the claim
again." *See* Exhibits CC-2 and CC-3 (doc. #17-31), attached to Norgren's Response in
Opposition.  That passage might suggest Mr. Benson viewed a dismissal without prejudice as
having a different substantive and prospective effect.

NPL also notes that in *Pre-Paid Legal Services* and *Sink,* judicial proceedings were commenced and then stayed pursuant to the parties' arbitration agreement and the mandate in § 3.  The appellate courts in those cases held that once the arbitration proceedings were terminated by default, there was no justification for barring  judicial relief.  Under NPL's interpretation of § 3, a party could only be in "default" where judicial proceeds were initiated and then stayed in favor of arbitration.  NPL would have this court effectively re-write § 3 to provide that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had in according with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such *[then pending]* arbitration.

By extension, NPL argues that *Pre-Paid Legal Services* is not controlling because NPL has paid its required fees in the Second Arbitration and is not in default in that particular proceeding. This argument, however, is squarely at odds with the Tenth Circuit's unambiguous statement that "a party's failure to pay its share of arbitration fees breaches the arbitration agreement and precludes any subsequent attempt by that party to enforce that agreement." *Pre-Paid Legal Servs., Inc.*, 786 F.3d at 1294.

Alternatively, NPL suggests that the dismissal of the First Arbitration has no preclusive effect because NPL did not waive its rights under the Purchase Agreement.  I am aware that the burden of showing a waiver of the right to arbitrate "is a heavy one in light of the strong federal policy in favoring arbitration."  *Lamkin v. Morinda Props. Weight Parcel, LLC*, 440 F. App'x 604, 610 (10th Cir. 2011).  However, the Tenth Circuit seems disinclined to distinguish between a "default" in proceeding with an arbitration and a "waiver of the right to arbitrate," particularly where the result under either approach would be the same.  *See Pre-Paid Legal Servs., Inc.,* 786

F.3d at 1295 n. 3.  *Cf. Planet Beach Franchising Corp. v. Richey*, 623 F. Supp. 2d 735, 738-39

(E.D. La. 2008) (finding, based on a review of case law, that "waiver" and "default" should be

treated synonymously in the context of § 3).

Moving to the merits of NPL's argument, the Tenth Circuit applies a six-factor test in

determining whether a party has waived their right to arbitrate:

> (1) whether the party's actions are inconsistent with the right to arbitrate; (2)
> whether the litigation machinery has been substantially invoked and the parties
> were well into preparation of a lawsuit before the party notified the opposing
> party of an intent to arbitrate; (3) whether a party either requested arbitration
> close to the trial date or delayed for a long period before seeking a stay; (4)
> whether a defendant seeking arbitration filed a counterclaim without asking for a
> stay of the proceedings; (5) whether important intervening steps [e.g., taking
> advantage of judicial discovery procedures not available in arbitration] had taken
> place; and (6) whether the delay affected, misled, or prejudiced the opposing
> party.

*In re Cox Enterprises, Inc.,* 790 F.3d 1112, 1116 (10th Cir. 2015) (quoting *Peterson v. Shearson/*

*Am. Exp., Inc.*, 849 F.2d 464, 467-68 (10th Cir. 1988) (suggesting that these six factors should

not be applied mechanically, but rather provide "certain principles that should guide courts in

determining whether it is appropriate to deem that a party has waived its right to demand

arbitration").  *Cf. Shy v. Navistar Int'l Corp.*, 781 F. 3d 820, 827-28 (6th Cir. 2015) ("A party

waives arbitration if it acts in a manner completely inconsistent with any reliance on an

arbitration agreement or delays asserting arbitration to such an extent that the opposing party

incur[red] actual prejudice.") (internal quotation marks omitted); *Apple & Eve, LLC v. Yantai N.*

*Andre Juice Co. Ltd.*, 610 F. Supp. 2d 226, 229 (E.D.N.Y. 2009) ("A party waives his right to

arbitrate when he actively participates in a lawsuit or takes other action inconsistent with that

right.").  *See also Plaintiffs' S'holders Corp. v. S. Farm Bureau Life Ins. Co.*, 486 F. App'x 786,

790-91 (11th Cir. 2012) (suggesting that a party's right to arbitrate, if previously waived, should

be not revived where the new proceeding makes only minor changes to the factual allegations or

claims previously asserted).

Here, the second, third, fourth and fifth factors identified in *In re Cox Enterprise* cut

against a finding of waiver as NPL has never sought to pursue litigation and never looked to

resolve its disputes with Norgren in a judicial forum.  Conversely, NPL's persistent refusal to

pay required fees in the First Arbitration or to provide the substantive materials requested by Mr.

Benson can be fairly described as actions "inconsistent with the right to arbitrate" as

contemplated by the parties' Purchase Agreement.  Norgren also contends that it has been

prejudiced to the extent that many of the witnesses it intended to use in the First Arbitration have

left Norgren in the intervening four years and may no longer be readily available to testify.  *Cf.*

*Planet Beach Franchising Corp.*, 623 F. Supp. 2d at 739 (in addressing whether a party's waiver

of an arbitration agreement results in prejudice to the other side, the court should consider "the

inherent unfairness in terms of delay, expenses, or damage to a party's legal position").  An

application of the Tenth Circuit's six-factor test does not conclusively favor one side or the other

in this case.

However, the concept of waiver "includes the broader idea that, regardless of intention, a

party's conduct may be such that it should be prevented on the basis of some equitable principle

from asserting a right to arbitration."  *Lamkin*, 440 F. App'x at 610 (internal quotation marks

omitted).  "Although waiver typically arises in circumstances where one party so substantially

utiliz[es] the litigation machinery that subsequent arbitration would prejudice the opposing party,

it is clear that conduct manifesting an abandonment of [the] arbitration forum [itself] can

constitute waiver."  *Liberty Mut. Grp., Inc. v. Wright*, No. DKC 12-0282, 2012 WL 1446487, at

*3 (D. Md. Apr. 25, 2012) (internal citations and quotation marks omitted).  Waiver in such a non-litigation context requires a showing that the waiving party (1) knew of an existing right to arbitration, (2) acted in a manner inconsistent with that right, and (3) caused prejudice to the opposing party through those inconsistent actions.  *Id.  See also N. Street, LLC v. Clipper Constr., LLC*, No. 08–4604, 2010 WL 3523025, at *2 (E.D. La. Sept. 2, 2010) (acknowledging that the question of default or waiver must be decided on the particular facts of each case); *Brownyard v. Md. Cas. Co.*, 868 F. Supp. 123, 126   (D.S.C. 1994) ( "There is no set rule as to what constitutes a waiver or abandonment of an arbitration agreement; the question depends on the facts of each case.").

The Purchase Agreement explicitly states that Colorado law is controlling.  In *Lawry v. Palm*, 192 P.3d 550 (Colo. App. 2008), the Colorado Court of Appeals explained that "[a] repudiation of a contract must consist of a party's present, positive, unequivocal refusal to perform the contract" and "occurs when a party to a contract makes an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." Id. at 558 (citing *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1014 (10th Cir. 2002)).   A party's conduct must be measured against an objective, rather than a subjective standard, and that party's statements must be sufficiently clear as to support a reasonable interpretation that the repudiating party will not or cannot perform as required under the contract.  *Id.*  "[L]anguage that is accompanied by a breach of nonperformance may amount to a repudiation even though, standing alone, it would be sufficiently positive."  *Id.*

So, for example, in *Samson v. NAMA Holdings, LLC,*, 637 F.3d 915, 932 (9th Cir. 2011),

the Ninth Circuit held that the trial court properly denied a motion to compel arbitration filed by

two individuals who, in an earlier proceeding, had insisted they were not parties to the arbitration

agreement at issue. The Ninth Circuit noted that if the trial court were to grant the motion to

compel arbitration, these two individuals

> would have lost nothing as a result of their refusal to arbitrate claims that were
> properly subject to arbitration; in fact, they would stand to gain a significant
> benefit, namely, the chance at a "do-over" of the already-completed merits
> hearing before the arbitration panel.  At a minimum, they would likely be
> afforded an opportunity to reopen a closed proceeding and present new evidence.

*Id.*  The court in *Samson* relied in large part on the earlier decision in *Brown v. Dillard's Inc.*,

430 F.3d 1004, 1010 (9th Cir. 2005), which held that "[h]e who seeks to enforce a contract must

show that he has complied with the conditions and agreements of the contract on his part to be

performed."[7]  Although the employment contract in *Brown* required the parties to arbitrate

employment-related claims, the defendant employer refused to pay its share of the arbitration

fees.  The Ninth Circuit rejected Dillard's suggestion that it could compel arbitration

"notwithstanding any possible breach of the arbitration agreement."  *Id.*  The court concluded

that by refusing to participate in properly initiated arbitration proceedings, Dillard had

effectively repudiated the arbitration agreement.  *Id.* at 1011.

Similarly, in this case, the record makes clear that NPL made a deliberate, albeit ill-

advised, decision to withhold required arbitration fees and ignore the arbitrator's request for pre-

hearing submissions, notwithstanding the parties' agreement to be bound by the AAA Rules.

---

[7]The Tenth Circuit, in *Pre-Paid Legal Services*, cited *Brown* as authority for the
proposition that a failure to pay required arbitration fees constitutes a default for purposes of § 3
of the FAA.  *Brown* is more properly read as upholding the proposition that a party who
repudiates an arbitration agreement forfeits its right to subsequently compel arbitration.

23

NPL persisted in that course of action despite repeated warnings that the arbitration proceedings would remain suspended until the required payments were made.  NPL never claimed an inability to pay its share of the fees required by the AAA Rules.  Rather, NPL suggested that it would consider paying additional fees only after Mr. Benson decided NPL's particular claim for damages.  *But see In re Tyco Int'l Ltd. Secs. Litig.*, 422 F.3d 41, 45 (1st Cir. 2005) (observing that "nothing in the [parties' arbitration agreement] . . . . nor in the case law" gave one side "a unilateral contractual right" to change the terms and conditions of the arbitration process).  NPL deliberately chose to abandon its position  in the First Arbitration even in the face of Mr. Benson's warning that the arbitration could proceed as to Norgren's counterclaim.  It is difficult to construe NPL's actions in the First Arbitration as anything other than a knowing and voluntarily waiver of its arbitration rights.

The benefits of arbitration (*e.g*., lower costs, greater efficiency, and speed) are well-recognized.  However, these laudable objectives may be frustrated if an arbitration provision is exploited as a tool for gamesmanship or evasion.  *See, e.g., In re Grupo Unidos Por El Canal, S.A.*, No. 14-mc-00226-MSK-KMT, 2015 WL 1810135, at *5 (D. Colo. Apr. 17, 2015) (citing *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1751 (2011)).  The Tenth Circuit has acknowledged that "arbitration laws are passed to expedite and facilitate the settlement of disputes and avoid the delay caused by litigation.  It was never intended that these laws should be used as a means of furthering and extending delays."  *In re Cox Enterprises, Inc.*, 790 F.3d at 1118 (quoting *Radiator Specialty Co. v. Cannon Mills*, 97 F.2d 318, 319 (4th Cir. 1938)).  *Cf. Menorah Ins. Co., Ltd. v. INX Reinsurance* Corp., 72 F.3d 218, 222-23 (1st Cir. 1995) ("Arbitration clauses were not meant to be another weapon in the arsenal for imposing delay and

costs in the dispute resolution process."); *Sucrest Corp. v. Chimo Shipping Ltd.*, 236 F. Supp. 229, 230 (S.D.N.Y. 1964) (holding that "[d]ilatory conduct or delay, in the face of a known duty to act," can be construed as "conduct inconsistent with an intention to arbitrate"). As the First Circuit explained in *In re Tyco Int'l Ltd. Secs. Litig.*, "[e]ven as justice delayed may amount to justice denied, so it is with arbitration." 422 F.3d at 46. "[A] party should not be allowed purposefully and unjustifiably to manipulate the exercise of its arbitral rights simply to gain an unfair tactical advantage over the opposing party." *Id.* at 47 n.5.

Based on upon the particular facts and circumstances of this case, and for the foregoing reasons, this court finds that by virtue of its actions in First Arbitration, NPL defaulted on or waived its arbitration rights under the parties' Purchase Agreement and is thereby barred from asserting those rights anew in the Second Arbitration. Accordingly, Defendant Ningbo Prance Long, Inc.'s Motion to Compel Arbitration and Stay Court Proceedings (doc. #12) is denied. This court will enjoin proceedings in the Second Arbitration pending NPL's decision whether to seek relief pursuant to 9 U.S.C. § 16(a)(1)(A) and the outcome of any resulting interlocutory appeal.

DATED this 22nd day of September, 2015.

BY THE COURT:


s/ Craig B. Shaffer
United States Magistrate Judge